**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

---------------------------------------------------------------- X

MATTHEW PIMM, MARIA WYNN, RAMON : 
REILOVA, APRIL GLANDT, and CAROLYN :
FAITH, Individually and as Representatives of a :
Class of Participants and Beneficiaries on Behalf :
of the UNITED AIRLINES CONSOLIDATED :
WELFARE BENEFIT PLAN, :
                                         :     Case No.
                  Plaintiffs, :     1:25-cv-15581
                                           :
                  v. :     **ORAL ARGUMENT REQUESTED**
                                           :

UNITED AIRLINES, INC., MERCER HEALTH :
& BENEFITS ADMINISTRATION, LLC, and :
JOHN DOES 1-20, :
                                           :
                  Defendants. :
                                           :

---------------------------------------------------------------- X

**MERCER HEALTH & BENEFITS ADMINISTRATION, LLC'S**
**MEMORANDUM IN SUPPORT OF ITS OPPOSED MOTION TO**
**DISMISS PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................ 1

FACTUAL BACKGROUND ....................................................................................................... 2

LEGAL STANDARD ................................................................................................................... 3

ARGUMENT ................................................................................................................................. 4

I.    Plaintiffs Fail to Establish Article III Standing. ........................................................... 4

II.   Plaintiffs' Fiduciary-Breach Claims as to Mercer Fail as a Matter of Law. ............................ 5

      A.    Count I Fails to State That Mercer is a Functional Fiduciary of the Plan. ..................... 5

            1.    Plaintiffs Fail to Plausibly Allege that Mercer Had Any Discretionary Authority over United's Selection of ReliaStar and Its Premiums. .......................................... 6

            2.    Plaintiffs Fail to Plausibly Allege that Mercer Had Any Discretionary Fiduciary Authority with Respect to Insurer-Paid Commissions. ......................................... 10

      B.    Plaintiffs Fail to Plead that Mercer Breached any Fiduciary Duty.............................. 12

            1.    Plaintiffs Fail to Allege Excessive Premiums. ......................................................... 13

            2.    Plaintiffs Fail to Allege Excessive Commissions. .................................................... 15

      C.    Count V Fails to State a Claim Against Mercer Based on Any Purported Fiduciary Breaches by United. ................................................................................................. 18

III.  Plaintiffs' Prohibited-Transaction Claims as to Mercer Fail as a Matter of Law. ................. 19

      A.    Count IV Fails to State a Prohibited-Transaction Claim Against Mercer. ................... 19

      B.    Count VI Fails to Allege that Mercer Is Liable as a Knowing Participant................... 20

            1.    Count VI is Too Conclusory to Survive a Motion to Dismiss................................... 20

            2.    Plaintiffs Fail to Plead a Transaction Involving Plan Assets. .................................. 20

            3.    Plaintiffs Fail to Plausibly Plead that Mercer was a Party-in-Interest.................... 21

IV.  Plaintiffs Fail to Show Entitlement to any Equitable Relief Against Mercer........................ 22

CONCLUSION............................................................................................................................ 22

## TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*Access Servs. of N. Ill. v. Capitol Adm'rs*,
2021 U.S. Dist. LEXIS 37582 (N.D. Ill. Mar. 1, 2021) .............................................................9

*Acosta v. Bd. of Trs. of Unite Here Health*,
2024 WL 3888862 (N.D. Ill. Aug. 21, 2024) ..........................................................................13

*Albert v. Oshkosh Corp.*,
47 F.4th 570 (7th Cir. 2022) .................................................................................13, 14, 17

*Appvion, Inc. Ret. Savings & Emp. Stock Ownership Plan by and through Lyon v. Buth*,
99 F.4th 928 (7th Cir. 2024) ...............................................................................14, 16, 18, 19

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).....................................................................................................3, 4, 6, 20

*Barchock v. CVS Health Corp.*,
886 F.3d 43 (1st Cir. 2018)........................................................................................................14

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).............................................................................................................3, 4, 7

*Chao v. Day*,
436 F.3d 234 (D.C. Cir. 2006) .................................................................................................9

*Chauvet v. Local 1199, Drug, Hosp. & Health Care Emps. Union*,
1996 WL 665610 (S.D.N.Y. Nov. 18, 1996)............................................................................19

*Clinton v. Baxter Int'l Inc.*,
2025 WL 3470685 (N.D. Ill. Dec. 3, 2025)..............................................................................13

*Comerica Bank for DALRC Retiree Benefit Tr. v. Voluntary Emp. Benefits Assocs., Inc.*,
2012 WL 12948705 (N.D. Ga. Jan. 11, 2012)..........................................................................11

*D.L. Markham DDS, MSD, Inc. 401(k) Plan v. Variable Annuity Life Ins. Co.*,
88 F.4th 602 (5th Cir. 2023) ...................................................................................................21

*Daly v. W. Monroe Partners, Inc.*,
2023 WL 2525362 (N.D. Ill. Mar. 15, 2023)..............................................................................6

*Depot, Inc. v. Caring for Montanans, Inc.*,
915 F.3d 643 (9th Cir. 2019) ...................................................................................................10

*Dinerstein v. Google, LLC*,
73 F.4th 502 (7th Cir. 2023) .......................................................................................................3

*Eversole v. Metro. Life Ins. Co.*,
500 F. Supp. 1162 (C.D. Cal. 1980) ...................................................................................9

*Farm King Supply, Inc. Integrated Profit Sharing Plan & Trust v. Edward D. Jones & Co.*,
884 F.2d 288 (7th Cir. 1989) ..............................................................................................8

*Fifth Third Bancorp v. Dudenhoeffer*,
573 U.S. 409 (2014)........................................................................................................4, 18

*Fink v. Union Cent. Life Ins. Co.*,
94 F.3d 489 (8th Cir. 1996) ..............................................................................................11

*Gallagher Corp. v. Massachusetts Mut. Life Ins. Co.*,
105 F. Supp. 2d 889 (N.D. Ill. 2000) ............................................................................8, 12

*Geinosky v. City of Chicago*,
675 F.3d 743 (7th Cir. 2012) .......................................................................................10, 14

*Georgas v. Kreindler & Kreindler*,
41 F. Supp. 2d 470 (S.D.N.Y. 1999)...................................................................................9

*Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*,
530 U.S. 238 (2000)...........................................................................................................21

*Hecker v. Deere & Co.*,
556 F.3d 575 (7th Cir. 2009) .............................................................................................15

*Hughes v. Nw. Univ.*,
63 F.4th 615 (7th Cir. 2023) ...............................................................................13, 14, 18

*Johnston v. Paul Revere Life Ins. Co.*,
241 F.3d 623 (8th Cir. 2001) .............................................................................................11

*Klosterman v. W. Gen. Mgmt., Inc.*,
32 F.3d 1119 (7th Cir. 1994) ...............................................................................................8

*Lalonde v. Mass. Mut. Ins. Co.*,
728 F. Supp. 3d 141 (D. Mass. 2024) ................................................................................18

*Leimkuehler v. Am. United Life Ins. Co.*,
713 F.3d 905 (7th Cir. 2013) .........................................................................................8, 12

*Limestone Dev. Corp. v. Village of Lemont*,
520 F.3d 797 (7th Cir. 2008) ...............................................................................................4

*Lockheed Corp. v. Spink*,
517 U.S. 882 (1996)...........................................................................................................21

iv

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992)..................................................................................................5

*Mahoney v. J.J. Weiser & Co.,*
    564 F. Supp. 2d 248 (S.D.N.Y. 2008)..........................................................8, 10, 11

*Martin v. CareerBuilder, LLC,*
    2020 WL 3578022 (N.D. Ill. July 1, 2020).............................................................13

*Mass. Laborer's Health & Welfare Fund v. Blue Cross Blue Shield of Mass.,*
    2022 WL 952247 (D. Mass. Mar. 30, 2022)............................................................10

*Matousek v. MidAmerican Energy Co.,*
    51 F.4th 274 (8th Cir. 2022) ...................................................................................13

*Mertens v. Hewitt Assocs.,*
    508 U.S. 248 (1993)................................................................................................22

*Montanile v. Bd. of Trs. of Nat'l Elevator Indus. Health Benefit Plan,*
    577 U.S. 136 (2016)................................................................................................22

*Mooney v. Ill. Educ. Assoc.,*
    942 F.3d 368 (7th Cir. 2019) ..................................................................................22

*Neil v. Zell,*
    2010 WL 11603191 (N.D. Ill. Mar. 11, 2010).........................................................12

*Pappas v. Buck Consultants, Inc.,*
    923 F.2d 531 (7th Cir. 1991) ....................................................................................8

*Pegram v. Herdrich,*
    530 U.S. 211 (2000)..................................................................................................6

*Rao v. BP Prods. N. Am., Inc.,*
    589 F.3d 389 (7th Cir. 2009) ....................................................................................6

*Renfro v. Unisys Corp.,*
    671 F.3d 314 (3d Cir. 2011).....................................................................................11

*Santomenno v. John Hancock Life Ins. Co. (U.S.A.),*
    768 F.3d 284 (3d Cir. 2014)................................................................................7, 11

*Santomenno v. Transamerica Life Ins. Co.,*
    883 F.3d 833 (9th Cir. 2018) ...................................................................................11

*Schulist v. Blue Cross of Iowa,*
    717 F.2d 1127 (7th Cir. 1983) .................................................................................11

v

*Scott v. Aon Hewitt Fin., Advisors, LLC,*
    2018 WL 1384300 (N.D. Ill. Mar. 19, 2018)................................................................11

*Sereboff v. Mid Atl. Med. Servs., Inc.*,
    547 U.S. 356 (2006)......................................................................................................22

*Thole v. U.S. Bank N.A.*,
    590 U.S. 538 (2020)........................................................................................................4

*Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*,
    843 F.3d 561 (2d Cir. 2016)..........................................................................................19

**Statutes**

ERISA § 3(14)(B), 29 U.S.C. § 1002(14)(B) ......................................................................21

ERISA § 3(21)(A)(i), (iii), 29 U.S.C. § 1002(21)(A)(i), (iii) ..............................................6

ERISA § 404(a), 29 U.S.C. § 1104(a) ..................................................................................5

ERISA § 406(a), 29 U.S.C. § 1106(a) ...........................................................................20, 21

ERISA § 406(b), 29 U.S.C. § 1106(b) ................................................................................19

ERISA § 408(b), 29 U.S.C. § 1108(b) ................................................................................12

ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) .......................................................................22

**Other Authorities**

Federal Rule of Civil Procedure 12(b)(1) ..........................................................................3, 5

Federal Rule of Civil Procedure 12(b)(6) ..........................................................................3, 5

Field Assistance Bulletin No. 2021-03 (Dec. 30, 2021),
    www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/field-
    assistance-bulletins/2021-03 ........................................................................................12

Heath Miller & Amy Hollis, *Blindsided: Are Supplemental Health Plans the next
    class action risk for plan sponsors?* ...............................................................................9

Mike Prendes, Focus on Voluntary Benefits, The Actuary (Sept. 2019),
    https://www.theactuarymagazine.org/focus-on-voluntary-benefits/.........................3

*OGC Opinion* No. 02-12-23, NYS Dep't of Fin. Servs.,
    https://www.dfs.ny.gov/insurance/ogco2002/rg021223.htm.....................................3

## INTRODUCTION[1]

Plaintiffs' Amended Complaint ("AC") fails to remedy the pleading deficiencies that compel dismissal of Mercer Health & Benefits Administration, LLC ("Mercer") from this case. The AC offers no new allegation whatsoever as to Mercer's role with respect to the selection of voluntary benefits insurance by United Airlines, Inc. ("United"),[2] and Plaintiffs continue to fail to plausibly allege that Mercer had a discretionary fiduciary role with respect to the selection of ReliaStar Life Insurance Company ("ReliaStar") for the United voluntary benefits plan (the "Plan"). These defects are fatal to Plaintiffs' claims against Mercer under ERISA.

The AC also fails to plausibly allege that the premiums ReliaStar collected were too high, or that the commissions ReliaStar paid to Mercer for its broker services breached any duty owed under ERISA. The AC fails to support Plaintiffs' allegation that they paid "excessive and unreasonable premiums" (¶ 3)[3] with any basis of comparison, as Plaintiffs fail to plead that the same insurance they elected was available on the market for *any* less. Unable to support their excessive-premium claim, Plaintiffs assert that ReliaStar paid excessive commissions to Mercer, and that Plaintiffs' premiums thus must have been excessive. However, Plaintiffs fail to support any inference that the commissions ReliaStar elected to pay Mercer had any bearing on the premiums charged to Plaintiffs. Plaintiffs also do not (and cannot) allege that ReliaStar's payment of commissions to Mercer resulted in any reduction in value of the benefits that Plaintiffs purchased. And even if Mercer's commissions were relevant to Plaintiffs' benefits, Plaintiffs make no apples-to-apples comparisons from which the Court could infer that Mercer's commissions

---

[1] Counsel for Mercer and United conferred with Plaintiffs' counsel by email about this motion to dismiss on May 19, 2026. Plaintiffs' counsel Mr. Ruben Chapa indicated that Plaintiffs would oppose.

[2] Mercer incorporates by reference the arguments in United's motion to dismiss, to the extent those arguments are not inconsistent with Mercer's arguments in this brief.

[3] "¶" citations refer to paragraphs of the AC.

were excessive compared to commissions paid to any other broker for comparable services.

At bottom, the AC does nothing more than launch a generalized attack on the use of commissions to compensate brokers for their services—a practice that Plaintiffs concede is a widespread industry norm. In the absence of plausible allegations that the total cost of their voluntary benefits was excessive (and thus suggestive of a fiduciary breach), Plaintiffs ask the Court to adopt the unprecedented view that any insurer that pays broker commissions *must be* charging excessive premiums. The Court should decline Plaintiffs' invitation to effectively outlaw the common and lawful practice of compensating brokers through commissions.

The AC should be dismissed, with prejudice, under Rules 12(b)(1) and 12(b)(6).

### FACTUAL BACKGROUND

Plaintiffs are current and former employees who purchased voluntary-accident, critical-illness, and/or hospital-indemnity-insurance policies through the Plan at disclosed premium rates. ¶¶ 2, 13-17, 126. They allege that United sponsors the Plan, is the Plan's named fiduciary, and exercises fiduciary authority with respect to the Plan, its assets, and its administration. ¶¶ 20-24.

Mercer is an insurance brokerage firm. ¶ 26. Plaintiffs claim that, "[a]s a matter of industry practice," brokers like Mercer are functional fiduciaries under ERISA because they exercise discretion in administering voluntary benefit plans. ¶ 99. They claim that "brokers such as Mercer … may … screen the bids" they receive from insurers and present employers with a "curated set of alternatives." ¶ 100. Although the AC refers to industry practice and what brokers *may* do, its allegations about what Mercer actually *did here* are scant. Plaintiffs allege that Mercer received commissions related to the Plan from 2020 to 2024, ¶ 124, and that Mercer recommended to United certain insurance companies to offer voluntary benefits policies, ¶ 154.

Plaintiffs allege that Mercer is compensated for its services through commissions paid by

2

the insurer out of premiums collected from participants, which premiums and commissions are disclosed to United and reported on its annual Forms 5500 filed with the U.S. Department of Labor. ¶¶ 89, 180. Plaintiffs concede these commissions were paid by insurers, not by the Plan or participants. ¶ 89. Plaintiffs and the authorities they rely on concede that the use of commissions to compensate brokers for their services is a common industry practice. *E.g.*, ¶¶ 82, 86, n.19.

Plaintiffs acknowledge that commissions are "part of an insurer's expenses." AC at n.20. As explained by *OGC Opinion No. 02-12-23* (cited AC n.20)[4], commission "rates are established contractually between the insurer and the broker" and "are part of an insurer's expenses." Insurance is a highly regulated industry and "the expense portion of an insurer's rate must be included in support of its rate filings made with" insurance regulators. *Id.* Commission structures vary, with some brokers receiving a higher rate of commission in the first year of a policy, and lower percentages in subsequent renewal years, while others receive level annual commissions. ¶¶ 94-96. The use of higher upfront commissions is "common." *See* Mike Prendes, *Focus on Voluntary Benefits*, THE ACTUARY (Sept. 2019)[5] (cited AC at n.23). Absent from the AC are any allegations about commission rates that ReliaStar paid Mercer in connection with the Plan.

### **LEGAL STANDARD[6]**

A complaint "must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).[7] "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Id*. Nor will "naked assertion[s] devoid of 'further factual enhancement." *Id.* "Factual

---

[4] https://www.dfs.ny.gov/insurance/ogco2002/rg021223.htm (last visited April 28, 2026).

[5] https://www.theactuarymagazine.org/focus-on-voluntary-benefits/ at https://perma.cc/63GM-HKC7.

[6] The *Twombly* and *Iqbal* pleading standard applies to both Rule 12(b)(6) and Rule 12(b)(1). *See Dinerstein v. Google, LLC*, 73 F.4th 502, 511 (7th Cir. 2023).

[7] Unless noted, all emphasis is added and internal quotations and citations are omitted.

allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[S]heer possibility" is not enough. *Iqbal*, 556 U.S. at 678.

The Seventh Circuit and the Supreme Court have emphasized that motions to dismiss are an "important mechanism for weeding out meritless claims" in the ERISA context. *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014). Absent careful scrutiny at the pleading stage, a "plaintiff with a largely groundless claim [will] simply take up the time of a number of other people, with the right to do so representing an in terrorem increment of the settlement value." *Limestone Dev. Corp. v. Village of Lemont*, 520 F.3d 797, 803 (7th Cir. 2008). Defendants should not be "forced to conduct expensive pretrial discovery to demonstrate the groundlessness of the plaintiff's claim," especially "on the basis of a threadbare claim." *Id.*

## ARGUMENT

### I.    Plaintiffs Fail to Establish Article III Standing.[8]

To establish standing, a plaintiff must "demonstrate (1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief." *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 540 (2020). Failure "to plausibly and clearly allege a concrete injury" compels dismissal. *Id.* at 544.

Plaintiffs do not allege any deficiency in the benefits they purchased or received, such as flaws in the nature or quality of the coverage. Their sole purported harm is that they paid too much for those benefits. But they fail to support that assertion with factual allegations. Notwithstanding their complaints about Mercer's commissions, Plaintiffs do not allege that *they* paid those

---

[8] Mercer joins United's argument (at Part III.A of its Motion to Dismiss) that Plaintiffs lack Article III standing.

4

commissions. They allege that commissions are an expense of *the insurer*. ¶¶ 89, 171, 179. Accordingly, while commission rates affect the insurer's bottom line, they do not affect Plaintiffs.

To satisfy standing, Plaintiffs must plausibly allege that *they* could have paid less for their voluntary benefits. While Plaintiffs assert that "they overpaid for premiums," ¶ 164, as discussed *infra*, Part II.B.1, Plaintiffs have not alleged any facts to show that lower premiums were available at all, much less for comparable benefits. Plaintiffs ground their conclusory overpayment assertions on the assumption that high commissions *must* mean high premiums, ¶¶ 165-207—a theory without factual support, ¶ 98. Plaintiffs invite the Court to make an inferential leap by crediting their conclusion that "[c]ommissions to brokers impact premiums to participants dollar-for-dollar." ¶ 84. But this speculative theory is "conjectural or hypothetical" and not "concrete and particularized." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). It is also undercut by Plaintiffs' allegations that factors *other than commissions* drive premium rates. *Infra*, Part II.B.1.

Plaintiffs further plead facts that *negate* their standing. They point to several other voluntary benefit plans that they claim had lower broker commission rates than United's Plan. ¶¶ 181-196. But in fact, many of Plaintiffs' "lower commission" plans actually had *higher* per-participant premiums than the United Plan. This confirms that Plaintiffs lack standing and dismissal under Rule 12(b)(1) is required. *See infra*, Part II.B.1.

## II. Plaintiffs' Fiduciary-Breach Claims as to Mercer Fail as a Matter of Law.

### A. Count I Fails to State That Mercer is a Functional Fiduciary of the Plan.

The AC fails to state a claim because it does not plausibly allege that Mercer was a fiduciary. ERISA's fiduciary duties bind only those who qualify as "a fiduciary." 29 U.S.C. § 1104(a)(1). This makes "the threshold question" in any ERISA fiduciary-breach claim whether a "person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the

5

action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000).

An entity is an ERISA fiduciary only "to the extent" it (a) "exercises any discretionary authority or discretionary control respecting management of [a] plan or exercises any authority or control respecting management or disposition of its assets," or (b) "has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A)(i), (iii). Fiduciary status "is not all-or-nothing." *Burke*, 42 F.4th at 725. "A person can be a fiduciary for one purpose without becoming a fiduciary for all purposes." *Daly v. W. Monroe Partners, Inc.*, 2023 WL 2525362, at *3 (N.D. Ill. Mar. 15, 2023).

Here, Plaintiffs attribute to Mercer fiduciary authority over the selection of ReliaStar, the setting of premium rates, and Mercer's own commissions. The AC, however, pleads no factual predicate to support these conclusory assertions.

### 1. Plaintiffs Fail to Plausibly Allege that Mercer Had Any Discretionary Authority over United's Selection of ReliaStar and Its Premiums.

Plaintiffs concede that United—not Mercer—is the "named fiduciary of the Plan." ¶ 21. Plaintiffs assert that Mercer "function[ed]" as a fiduciary by exercising discretion over the Plan. ¶ 99. However, most of Plaintiffs' allegations are not specific to Mercer at all, but rather are inapplicable legal principles and conclusions or generalized industry observations.

Plaintiffs baldly allege that Mercer is a fiduciary of the Plan by reciting the text of 29 U.S.C. §§ 1002(21)(A)(i) and (iii). ¶ 28. Such "[t]hreadbare recitals" of ERISA's fiduciary definition, "supported by mere conclusory statements," are the paradigm of what *Iqbal* deems insufficient. 556 U.S. at 678; *see also Rao v. BP Prods. N. Am., Inc.*, 589 F.3d 389, 399 (7th Cir. 2009). Plaintiffs further cite and quote numerous legal authorities, but they fail to link these holdings to any conduct by Mercer here. ¶¶ 149-153. Plainly missing from the AC is any factual development about *Mercer* and the broking services it *actually* provided to United.

Similarly, Plaintiffs' generalized allegations about the insurance and brokerage industry provide no basis from which to infer that Mercer had discretionary authority over the selection of ReliaStar. At best, the AC offers generic descriptions of the "role of brokers" "[a]s a matter of industry practice" that shed no light on Mercer's actual role here. *E.g.*, ¶¶ 76-82 (discussing an unrelated broker and citing industry publications). Indeed, Plaintiffs concede that their allegations about Mercer's role are mere speculation, describing the legal duties that would attach "*if an employer-fiduciary … chooses to delegate to a broker*," and noting that some brokers "*may* also screen" bids from insurers, "present" the options to the employer, or limit an employer's choices "to only options where commissions are favorable to the broker" such that they exercise "discretionary authority or discretionary control respecting management of the plan." ¶¶ 77, 100-102. These are guesses, not factual allegations. Pleading only a mere "possibility" that Mercer performed functions that other brokers in the industry might have performed elsewhere fails to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555-57. And even if these generalized allegations were credited as to Mercer, at best they describe a role consisting only of reviewing and presenting options *for the employer's ultimate selection*, which supports no inference of discretionary authority on Mercer's part. *See Santomenno v. John Hancock Life Ins. Co. (U.S.A.)*, 768 F.3d 284, 296 (3d Cir. 2014) (provider's monitoring of plan features did not give rise to fiduciary status where plan sponsor retained "ultimate authority" for selection).

Plaintiffs themselves allege that United was the named fiduciary of the Plan, "with overall authority to control and manage the operation and administration of the Plan." ¶¶ 21, 248. Plaintiffs do not allege, nor could they, that United delegated to Mercer its authority to select an insurer. At most, the AC alleges that Mercer "recommend[ed] the insurance company." ¶ 90. But Mercer does not assume fiduciary status by presenting United with possible insurance carrier

7

options. As Plaintiffs acknowledge, "[m]erely selling insurance to a Plan, with nothing more, does not automatically create a fiduciary relationship." ¶ 150.

Curating a menu of options for a plan to choose from is not a fiduciary function. *See Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 911-12 (7th Cir. 2013). Where an entity lacks "control over which insurer and which insurance product [the plan] ultimately" chooses, that is not "an exercise of discretionary authority" and thus "does not render [that entity] an ERISA fiduciary." *Gallagher Corp. v. Massachusetts Mut. Life Ins. Co.*, 105 F. Supp. 2d 889, 894 (N.D. Ill. 2000).

This well-established principle applies to brokers too. *See Klosterman v. W. Gen. Mgmt., Inc.*, 32 F.3d 1119, 1123 (7th Cir. 1994) (broker's presentation of insurance recommendations were "insufficient as a matter of law to render [the broker] a fiduciary with respect to the plan"). Even where a commission-based broker *also* served as plan administrator (unlike here), the broker did not become a fiduciary simply by recommending insurance options for the plan. *See Mahoney v. J.J. Weiser & Co.*, 564 F.Supp.2d 248, 256-57 (S.D.N.Y. 2008), *aff'd*, 339 F. App'x 46 (2d Cir. 2009). This did not "convert [the broker] into a fiduciary" absent an allegation that the broker "had the authority to force the [Plan] to accept" its recommendations. *Id.* at 256. What matters is "actual decision-making power," which brokers typically lack. *See Pappas v. Buck Consultants, Inc.*, 923 F.2d 531, 535 (7th Cir. 1991) ("[T]he terms 'discretionary authority,' 'discretionary control,' and 'discretionary responsibility' in § 1001(21)(A) . . . speak[] to *actual decision-making power* rather than to the influence that a professional may have over the decisions made by the plan trustees she advises."); *see also Farm King Supply, Inc. Integrated Profit Sharing Plan & Trust v. Edward D. Jones & Co.*, 884 F.2d 288, 294-95 (7th Cir. 1989) ("Only the trustees had discretionary authority or control over the Plan's assets; all [broker] did was try to convince the trustees to exercise some

discretionary authority in such a way as to benefit [broker].").

Plaintiffs' authorities do not say otherwise. One notes that "brokers themselves are not fiduciaries" and "do not owe a fiduciary duty to the employer, the plan or the participants."[9] *Access Services of Northern Illinois v. Capitol Administrators, Inc.* (cited ¶ 152) merely says that "exercising *final discretion* in the choice of which insurance provider and plan to choose does create a fiduciary duty under ERISA," but "offering insurance plans for sale or recommending options does not." 2021 WL 780483, at *4 (N.D. Ill. Mar. 1, 2021). Plaintiffs' own allegations place Mercer in the latter camp.[10] *Georgas v. Kreindler & Kreindler* (cited ¶ 153) dismissed allegations that a broker was a plan fiduciary. 41 F. Supp. 2d 470, 475 (S.D.N.Y. 1999).

Additionally, Plaintiffs' allegation that Mercer administered claims and controlled communications under the policies (¶ 155) does not plead any fiduciary status relevant to Plaintiffs' premium. Plaintiffs offer zero factual detail about what Mercer purportedly did to administer claims or control communications under the policies. Once again, Plaintiffs' cited authority is off point. *Eversole v. Metropolitan Life Insurance Co.* (cited ¶ 151) merely recognizes that an *insurer* "may … be a fiduciary by virtue of its management or control" of an insurance policy where it was delegated discretionary "authority to grant or deny claims." 500 F. Supp. 1162, 1165-66 (C.D. Cal. 1980). Plaintiffs do not allege that here. Even if they had, such allegations would be detached from any alleged breach, and thus could not supply the requisite fiduciary status for that breach. "[T]here must be some connection between the discretion exercised and the breach of duty." *Mahoney*, 564 F. Supp. 2d at 257 (allegations that broker was a fiduciary "with regard to

---

[9] Heath Miller & Amy Hollis, *Blindsided: Are Supplemental Health Plans the next class action risk for plan sponsors?*, EMPLOYEES FIRST (June 2025) (cited AC at 17, n.15).

[10] *Chao v. Day*, 436 F.3d 234, 237-38 (D.C. Cir. 2006) (¶ 157) is off-base, as *Day* discusses a scenario in which where a broker "solicited, accepted, and then pilfered the plans' assets by reneging on his promise to purchase insurance for the plans' members," instead taking the money for his own use.

9

the processing of claims" was irrelevant to whether it was a fiduciary with regard to premiums and commissions, where broker did not have ultimate authority to choose the insurer).

### 2. Plaintiffs Fail to Plausibly Allege that Mercer Had Any Discretionary Fiduciary Authority with Respect to Insurer-Paid Commissions.

Plaintiffs assert that Mercer had fiduciary duties with respect to the commissions it received from ReliaStar. AC at 30. This theory fails under well-settled authority, on two grounds.

First, Plaintiffs' theory that Mercer "exercised authority or control over the management or disposition of the Plan's assets" by receiving "excessive commissions from Plan assets" rests on the false notion that commissions are paid "from Plan assets." ¶ 28 & pp. 26-28. Plaintiffs *concede* that these commissions are paid "by the insurance company," not United, the Plan, or participants. ¶ 89.[11] Thus, Mercer's receipt of commissions is *not* any exercise of control over Plan assets.

Plaintiffs' allegation that commissions came "directly out of Plan participants' premium payments" (¶ 165) does not salvage this theory of fiduciary authority. Even if premiums were plan assets *before* going to ReliaStar, they were not plan assets once in the insurer's hands. *See Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 657-59 (9th Cir. 2019) (under "ordinary notions of property rights," "[p]remiums paid to an insurance company in return for coverage under a fully insured insurance policy are not 'plan assets'"); *see also Mass. Laborer's Health & Welfare Fund v. Blue Cross Blue Shield of Mass.*, 2022 WL 952247, at *12-13 (D. Mass. Mar. 30, 2022) (premiums not plan assets), *aff'd*, 66 F.4th 307 (1st Cir. 2023). Thus, even if commissions are set as a percentage of premiums, they are "paid from assets of the carriers," not from "plan assets."

---

[11] The Plan's Forms 5500 further confirm that the commissions are paid by the insurer, not the Plan. These commissions were reported in line 3(b) of Schedule A to the Plan's 2024 Form 5500. *E.g.,* Ex. C, United 2020 Form 5500, at 5. The Form 5500 instructions make clear that any commissions reported in line 3(b) are "paid by an insurer." Ex. XX, Form 5500 Instructions, at 4. The Court may take judicial notice of the Plan's Form 5500 filings, because the Complaint relies on them (at ¶ 180). *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012).

10

*Comerica Bank for DALRC Retiree Benefit Tr. v. Voluntary Emp. Benefits Assocs., Inc.*, 2012 WL 12948705, at *15-16 (N.D. Ga. Jan. 11, 2012).

Second, even if Mercer's commissions were paid by the Plan (which Plaintiffs concede they are not), Mercer is not a fiduciary as to its own compensation. "[I]t is well-established that a service provider who negotiates its own compensation with a plan fiduciary at arm's length is not a fiduciary for that purpose." *Scott v. Aon Hewitt Fin., Advisors, LLC*, 2018 WL 1384300, at *8 (N.D. Ill. Mar. 19, 2018). Plan sponsors "exercise final authority over th[e] arrangement and [are] free to reject it or seek better terms." *Id.* Fiduciary status arises only when a service provider exercises an ability to "*unilaterally* control the compensation it would receive." *Id*.

Absent such control, service providers are not fiduciaries over their own compensation. *Schulist v. Blue Cross of Iowa*, 717 F.2d 1127, 1132 (7th Cir. 1983); *see also Santomenno v. Transamerica Life Ins. Co.*, 883 F.3d 833, 838 (9th Cir. 2018) ("[A] service provider owes no fiduciary duty with respect to the negotiation of its fee compensation."); *Renfro v. Unisys Corp.*, 671 F.3d 314, 324 (3d Cir. 2011) (same); *Santomenno*, 768 F.3d at 293 (same).

These principles apply equally to insurance brokers. Even where an insurance broker allegedly received "excessive premiums" and "high commissions" after making insurance recommendations to a plan, this did not make it "an ERISA fiduciary." *Mahoney*, 564 F. Supp. 2d at 256-57. Insurance brokers "are not ERISA fiduciaries unless they transcend the normal role and exercise discretionary authority." *Johnston v. Paul Revere Life Ins. Co.*, 241 F.3d 623, 632 (8th Cir. 2001); *see also Fink v. Union Cent. Life Ins. Co.*, 94 F.3d 489, 493 (8th Cir. 1996) (collecting commissions after recommending insurance options does not turn a broker into a "fiduciary").

Consistent with this longstanding backdrop treating brokers as non-fiduciaries (absent unusual circumstances not present here), Congress amended ERISA in 2021 to require insurance

11

brokers for group health plans to disclose compensation-related information *to* the "responsible plan fiduciary." *See* 29 U.S.C. § 1108(b)(2)(B)(iii). Congress defined "responsible plan fiduciary" as "a fiduciary with authority to cause the covered plan to enter into, or extend or renew, the contract or arrangement." *Id.* § 1108(b)(2)(B)(ii)(I)(ee). DOL guidance explains that these "disclosures are intended to provide the responsible plan fiduciary with sufficient information to assess the reasonableness of the compensation to be received and potential conflicts of interest that may exist." Field Assistance Bulletin No. 2021-03 (December 30, 2021).[12] These disclosure obligations further confirm that ERISA does not treat brokers *themselves* as the fiduciaries.

Here, Plaintiffs do not allege that Mercer exercised any discretion with respect to rates of commissions paid by ReliaStar. Nor do Plaintiffs allege that United was not "free to select a different … service provider or none at all." *Leimkuehler*, 713 F.3d at 912. "The Seventh Circuit [has] held that [a service provider] did not exercise discretionary authority over the trustees even if it urged them to purchase a bad insurance product with inordinately high premiums." *Gallagher Corp.*, 105 F. Supp. 2d at 897. This freedom to choose a provider other than Mercer, and the fact that Mercer did "disclose the bottomline cost" of the recommended policies, *Leimkuehler*, 713 F.3d at 912, means that Mercer could *not* have been a functional fiduciary with respect to the commission rates paid by ReliaStar.[13]

### B.    Plaintiffs Fail to Plead that Mercer Breached any Fiduciary Duty.

Had Plaintiffs plausibly alleged that Mercer acted in a fiduciary capacity with respect to the Plan (which they did not), Count I would still fail to plead a breach of duty.

Count I alleges that Defendants breached the duty of prudence by failing to use any

---

[12] www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/field-assistance-bulletins/2021-03.

[13] Plaintiffs' "co-fiduciary" theory of liability (¶ 245) fails for the same reason. *Neil v. Zell*, 2010 WL 11603191, at *8 (N.D. Ill. Mar. 11, 2010).

12

fiduciary process to monitor and control premiums or broker commissions and causing participants to overpay for voluntary benefits insurance. *See, e.g.*, ¶¶ 7, 239-241. Fiduciary prudence is a "processed-based, not outcome-based" standard. *Martin v. CareerBuilder, LLC*, 2020 WL 3578022, at *4 (N.D. Ill. July 1, 2020). Plaintiffs plead no facts concerning any act or process undertaken by any Defendant with respect to the Plan's voluntary benefits insurance, let alone any specific allegations concerning Mercer's role in that process. ¶¶ 239-241. Absent such allegations, Plaintiffs must allege facts that support "an inference that the process must have been flawed." *See Clinton v. Baxter Int'l Inc.*, 2025 WL 3470685, at *4 n.7 (N.D. Ill. Dec. 3, 2025). The AC's assertions that participants "overpaid for premiums" (*e.g.*, ¶ 164) and that Mercer received "excessive commission[s]" (*e.g.*, ¶ 166) support no inference of a flawed fiduciary process.

### 1. Plaintiffs Fail to Allege Excessive Premiums.

To state an ERISA imprudence claim based on purportedly excessive fees, a plaintiff must "plead[] sufficient facts to render it plausible that [the plan] incurred ***unreasonable*** … fees." *Hughes v. Nw. Univ.*, 63 F.4th 615, 631 (7th Cir. 2023). "[A] complaint cannot simply make a bare allegation that costs are too high . . . . Rather, it must provide a sound basis for comparison—a meaningful benchmark." *Albert v. Oshkosh Corp.*, 47 F.4th 570, 581 (7th Cir. 2022); *see Acosta v. Bd. of Trs. of Unite Here Health*, 2024 WL 3888862, at *7 (N.D. Ill. Aug. 21, 2024) ("[A]n ERISA plaintiff alleging excessive costs must give enough comparative context to permit the reasonable inference that the fiduciary is spending too much for what they are getting in return."). Such a "meaningful benchmark" requires a "like-for-like comparison" based on plausible allegations that "similarly sized plans spend less" for the same thing. *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 278-79 (8th Cir. 2022) (affirming dismissal).

A complaint must allege ***facts***—not conclusions—showing the plan could have received

13

similar benefits for less. *See Hughes*, 63 F.4th at 631. To withstand dismissal, an excessive-fee claim must plausibly "allege that the . . . fees were excessive relative to the services rendered." *Albert*, 47 F.4th at 580. Here, Plaintiffs fail to support their assertion that they paid "excessive and unreasonable premiums" with any factual development. ¶ 3. The AC alleges ranges of annual premiums for the Plan for each category of voluntary benefit (at ¶ 126), but provides no basis of comparison from which the Court could conclude premiums were excessive. Plaintiffs do not identify any insurer that offers lower premiums for comparable coverages, or any plan receiving comparable coverages for lower rates. Their conclusory assertion that premiums were "excessive" is insufficient as a matter of law. *See Albert*, 47 F.4th at 581-82.[14]

While the Court may end its inquiry there, it is notable that Plaintiffs' own allegations undercut their claim that the premiums were excessive. The AC identifies fifteen "similar" plans that offer voluntary benefit programs. ¶¶ 181-196. Despite Plaintiffs' claim that they "pa[id] increased, excessive, and unreasonable premiums," *id.* ¶ 172, conspicuously absent from the AC are any data on premiums paid by comparator plans. Premium data in the publicly-available Forms 5500 that the AC relies on do not support Plaintiffs' allegations.[15] The data for 2023, for example, show that participants in approximately half of the purported comparator plans (four out of nine) paid *higher* average premiums than United. Decl. ¶ 5, Ex. A.[16]

All Plaintiffs have pled is that there is a range of premiums in the market, and the Plan falls within that range. Fees within a market range support no inference of breach. *See Barchock v. CVS Health Corp.*, 886 F.3d 43, 52-53 (1st Cir. 2018) (no breach unless plan was a "severe outlier").

---

[14] Plaintiffs' failure to allege excessive premiums also means that they have failed to carry their burden of pleading harm, a necessary element of any fiduciary-breach claim. *See Appvion, Inc. Ret. Savings & Emp. Stock Ownership Plan by and through Lyon v. Buth*, 99 F.4th 928, 942-43 (7th Cir. 2024).

[15] The Court may take judicial notice of these Form 5500 filings because the Complaint relies on them (at ¶¶ 155-158). *Geinosky*, 675 F.3d at 745 n.1; *see also supra* note 11.

[16] All "Ex. __" cites are to exhibits attached to the Declaration of Alison V. Douglass ("Decl.").

Rather than support their assertion that commissions dictate premium levels, Plaintiffs plead that premiums are based on "complex actuarial calculations that depend on the demographics of a workforce, the employer's industry, the size of the workforce, and benefits offered." ¶ 198. Plaintiffs' cited sources (n.38) do not attribute premium rates to brokerage commissions at all. And again, an analysis of Plaintiffs' own purported comparator plans' data refutes the correlation between commissions and premiums that Plaintiffs baldly allege. Decl. ¶ 6, Ex. B.

In short, the AC fails to plausibly allege that Plaintiffs paid *any* more than they should have for the insurance products they elected to purchase.

### 2. Plaintiffs Fail to Allege Excessive Commissions.

Unable to allege that the Plan's premiums were excessive, Plaintiffs attempt to argue that premiums must have been excessive because broker commissions paid out of premiums (they claim) must have driven up premiums. ¶¶ 98, 171-172. This attempt fails for several reasons.

First, Plaintiffs fail to establish that anything about Mercer's commissions caused participants to overpay for benefits. Premiums alone reflect the total cost to participants of voluntary benefits insurance. Plaintiffs' failure to plead that total premiums were excessive (*see supra*, Part II.B.1) forecloses their fiduciary-breach claim. Courts have rejected fiduciary-breach claims premised on post-collection allocation of participants' fees, holding that "[t]he total fee, not the internal, post-collection distribution of the fee, is the critical figure for" participants. *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009). This reflects ERISA's focus on total costs to participants and plans. What matters is whether the premiums *participants* paid were comparatively high, not whether the commissions *insurers* paid were comparatively high.[17] Even if Plaintiffs could show high commissions, they cannot sustain a fiduciary-breach claim without

---

[17] This issue frequently arises in the context of revenue-sharing arrangements, where mutual funds pay a portion of the fees they collect to service providers. *E.g., Hecker*, 556 F.3d at 586.

showing they were harmed by those commissions. *See Appvion, Inc. Ret. Savings & Emp. Stock Ownership Plan by and through Lyon v. Buth*, 99 F.4th 928, 942-43 (7th Cir. 2024) (to sustain a fiduciary-breach claim, a plaintiff must show they were harmed by the claimed breach).

Second, Plaintiffs fail to plausibly allege that commissions ReliaStar paid to Mercer were excessive. Plaintiffs' excessive-commission claim is based on their comparison of the average commissions that Mercer received (¶¶ 160-161, 202) with purportedly "typical" commission rates "in the industry" (¶¶ 92, 166-167) and commission rates that Plaintiffs allege various brokers received in connection with benefits offered under other, unrelated plans (¶¶ 181-196).

Plaintiffs' allegations about "typical" broker commissions fall well short of supporting a plausible inference that Mercer's commissions were excessive. The AC's benchmarks are internally inconsistent—alleging at ¶ 92 that voluntary-benefit-insurance commissions range from 15% to 55% on average, and at ¶¶ 166-167 that the average is 2-10%. Plaintiffs also provide no source or data to support these purported benchmarks. ¶ 166 (no source); ¶ 167 (citing a source that offers no data or time period); ¶ 92 (citing a source that offers no data or time period). They also plead nothing about the nature or quality of the coverages reflected in the supposed benchmarks to confirm comparability to the coverages at issue here. In any event, the average commission Plaintiffs estimate for the Plan (36.4%) falls squarely in the middle of the 15%-55% range that they allege to be typical of other plans, and is therefore not an "outlier." ¶¶ 92-93, 180.

Plaintiffs' allegations concerning broker commissions paid in connection with a dozen cherry-picked plans (¶¶ 181-196) likewise fail to support any inference that Mercer's commissions were excessive. The Seventh Circuit has made clear that an excessive-fee claim fails without "detailed allegations providing a sound basis for comparison" to other options on the market. *Albert*, 47 F.4th at 581. Plaintiffs' comparator plan allegations fall short of this standard. Plaintiffs

16

offer no facts concerning the nature and quality of the insurance or broking services for those plans. Several of the comparator plans used brokers other than Mercer, and Plaintiffs do not (and cannot) allege that all brokers provide identical services. Plaintiffs also plead that broker commission models vary, with some brokers receiving more in upfront ("heaped") commissions, and others receiving level commissions over time. ¶ 94-96. Yet Plaintiffs fail to plead which commission model either Mercer or their comparator plans utilized, rendering year-to-year comparisons meaningless. Their comparisons thus fail to supply sufficiently "detailed allegations providing a sound basis for comparison"—i.e., a meaningful benchmark. *Albert*, 47 F.4th at 581. Courts regularly dismiss excessive-fee imprudence claims for lack of appropriate comparators. *See, e.g.*, *id.* at 579-80 (affirming dismissal on this ground). This Court should do the same.

Third, Plaintiffs' extensive discussion of loss ratios provides no support for allegations that premiums and/or commissions were too high. ¶¶ 104-116. Loss ratios speak only to how much of each dollar collected in premiums is paid out in claims—two factors over which brokers have no control—and therefore only concern the profitability of insurance policies *for insurers*, not whether premiums or broker commissions were excessive. ¶ 104. As Plaintiffs concede, an insurer could experience a high loss ratio (*i.e.*, low profitability) on an expensive insurance coverage if it faces an unexpected onslaught of claims, but experience a low loss ratio (*i.e.*, high profitability) on a less expensive coverage if it receives fewer claims. ¶ 106. In any event, Plaintiffs do not plausibly plead loss ratios for the Plan here (they merely speculate that it has an "estimated" loss ratio of "significantly less than 50%," ¶ 169), and concede that the loss-ratio benchmark they plead from the Affordable Care Act does not apply to voluntary benefits. ¶¶ 107-109.

Finally, Plaintiffs' attempt to tease a fiduciary-breach claim from the widespread practice of insurance commissions also fails. Plaintiffs' assertion that, under a commission-based system,

17

Mercer "stood to benefit from recommending the company with the highest price, rather than the lowest price" (¶ 90) sounds in disloyalty, not imprudence—and Plaintiffs do not assert any such claim. Even if they had, alleging a mere "potential conflict of interest" is insufficient to state a fiduciary-disloyalty claim. *See Lalonde v. Mass. Mut. Ins. Co.*, 728 F. Supp. 3d 141, 155 (D. Mass. 2024). Plaintiffs' theory would create near-universal liability for commission-based insurance sales to ERISA plans. Ascribing *per se* ERISA liability for a standard insurance industry practice violates the basic principle that fiduciary standards are necessarily "context specific." *Dudenhoeffer*, 573 U.S. at 425. "[C]ategorical rule[s] [are] inconsistent with the context-specific inquiry that ERISA requires." *Hughes*, 595 U.S. at 173.

**C.      Count V Fails to State a Claim Against Mercer Based on Any Purported Fiduciary Breaches by United.**

Plaintiffs also claim that, even if Mercer is not a fiduciary, it is liable for fiduciary breaches purportedly committed by United. Not so.

As an initial matter, the Seventh Circuit has never held that non-fiduciaries like Mercer (*see supra*, Part II.A.1) may be liable for others' fiduciary breaches. *See Appvion*, 99 F.4th at 956 (noting this Circuit has expressly left the question open). It should not do so here.

Even if the claim were cognizable, it would *at minimum* require as much as would be necessary to establish co-fiduciary liability. This requires plausible allegations that Mercer at least knew of United's "breach, and that [it] either knowingly participated in or concealed that breach." *See id.* at 949. Count V fails under this standard.

First, Plaintiffs fail to plausibly allege any breach by United. *See supra*, Part II.B; Part III.B of United's Motion to Dismiss. Thus, any attempt to ascribe secondary liability to Mercer fails.

Second, Plaintiffs fail to allege "knowing participation in [any] breach" as they would need to do. *Appvion*, 99 F.4th at 949. Plaintiffs do not allege that Mercer had knowledge of, or even

18

reason to second-guess, United's monitoring of premiums and broker commissions. The AC fails to plead that Mercer "affirmatively assist[ed], help[ed] conceal, or by virtue of failing to act when required to do so enable[d] [the fiduciary breach] to proceed" by participating in it. *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 571 (2d Cir. 2016).

Even if allowing Mercer to collect excessive commissions could constitute a breach (*contra supra*, Part II.B.2), any theory that Mercer is secondarily liable because it should have known its commissions were excessive (which the AC fails to demonstrate) still fails. Plaintiffs do not allege that Mercer received more than the commissions it bargained for, and Mercer has no duty to monitor plan fiduciaries or negotiate against itself. *See supra* Part II.A; *see also Chauvet v. Local 1199, Drug, Hosp. & Health Care Emps. Union*, 1996 WL 665610, at \*14 (S.D.N.Y. Nov. 18, 1996) (rejecting a theory that "non-fiduciaries are under an affirmative obligation to oversee and to ensure that fiduciaries do not breach their ERISA duties").

## III. Plaintiffs' Prohibited-Transaction Claims as to Mercer Fail as a Matter of Law.

### A. Count IV Fails to State a Prohibited-Transaction Claim Against Mercer.

Count IV alleges that Mercer engaged in prohibited transactions by "collecting excessive commissions and other payments from Plan assets" in violation of the prohibitions set forth in ERISA Sections 406(b)(1) and (b)(3). ¶¶ 268-270. This claim fails for two independent reasons.

Section 406(b) of ERISA only applies to a "fiduciary." 29 U.S.C. § 1106(b). As explained *supra*, Part II.A, Plaintiffs fail to allege that Mercer functioned as a fiduciary at all, let alone as to the complained-of conduct (collecting commissions). As fiduciary status is an element of any § 406(b) claim, the failure to plead Mercer's fiduciary status requires dismissal of Count IV.

Even if Plaintiffs had plausibly alleged that Mercer functioned as a fiduciary, Count IV would still fail because it is premised on Plaintiffs' assertion that Mercer "collect[ed] excessive

19

commissions and other payments from Plan assets" (¶ 270), but, as discussed *supra*, Part II.A.2, commissions are not plan assets.

## B.       Count VI Fails to Allege that Mercer Is Liable as a Knowing Participant.

Count VI attempts to hold Mercer liable for prohibited transactions under three provisions of ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), all of which prohibit certain transactions between a plan and a "party in interest." This claim fails for several reasons.

### 1.       Count VI is Too Conclusory to Survive a Motion to Dismiss.

Plaintiffs allege that Mercer "knew that by selecting and retaining Mercer as a broker for the voluntary benefits insurance, and by causing Plan assets to be transferred to Mercer as payment for premiums and/or commissions, United caused the Plan to engage" in three types of prohibited transactions. ¶¶ 289-291 (tracking the language in 29 U.S.C. §§ 1106(a)(1)(A), (C), (D)).[18] These conclusory allegations merely recite statutory provisions; they do not identify any particular transaction, let alone one involving Plan property, or any furnishing of goods, services, or facilities to the Plan. "Threadbare recitals of the elements of a cause of action" like these are never sufficient to survive a motion to dismiss. *Iqbal*, 556 U.S. at 678.

### 2.       Plaintiffs Fail to Plead a Transaction Involving Plan Assets.

Count VI hinges on the allegation that United caused the Plan to engage in prohibited transactions with Mercer by "causing Plan assets to be transferred to Mercer as payment for premiums and/or commissions." ¶¶ 289-291. Plaintiffs fail to plausibly allege that Mercer received premiums; indeed, they plead the opposite: that premiums were paid to the insurer. ¶ 89; *e.g.,* Ex. C, United 2020 Form 5500, at 8 (reporting premiums collected *by ReliaStar*); *see also supra*, Part

---

[18] Paragraph 125 also states that "[i]t is reasonable to infer that Mercer collected additional undisclosed compensation, based on Mercer's known practices and those in the industry." ¶ 125. It is unclear what this allegation refers to, what it is based on, or why such an inference is supposedly "reasonable."

II.A.2. There is no non-conclusory allegation in the AC that Mercer itself received any premium payments—even assuming those payments were Plan assets at some point. The commissions paid to Mercer cannot form the basis for a prohibited transaction, as they did not involve plan assets.

Section 406(a)(1) of ERISA is designed to prevent "commercial bargains that present a special risk of plan underfunding because they are struck with plan insiders, presumably not at arm's length." *Lockheed Corp. v. Spink*, 517 U.S. 882, 893 (1996). "What the 'transactions' identified in § 406(a) thus have in common is that they generally involve *uses of plan assets* that are potentially harmful to the plan." *Id.* Plaintiffs' allegations regarding Mercer's receipt of commissions from an insurer fail to plead any transaction involving "plan assets" subject to § 406(a). While the AC alleges Mercer received commissions, it makes clear that those payments were made by insurers rather than the Plan or its participants. As such, those commissions were *not* plan assets, *see supra*, Part II.A.2, and thus cannot form the basis for a claim under § 406(a)(1).

### 3. Plaintiffs Fail to Plausibly Plead that Mercer was a Party-in-Interest.

Count VI fails for another, independent reason: Plaintiffs fail to plausibly allege that Mercer was a "party in interest" of the Plan at the relevant time. Each § 406(a) subpart describes a plan's transaction with a "party in interest," 29 U.S.C. § 1106(a), which ERISA defines to include "a person providing services to [a] plan," *id.* § 1002(14)(B). "Congress defined 'party in interest' to encompass those entities that a fiduciary might be inclined to favor at the expense of the plan's beneficiaries." *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 242 (2000).

Courts have recognized that a service provider is not a "party in interest" of the plan at the time it negotiates its contract, even if it becomes one later. *See D.L. Markham DDS, MSD, Inc. 401(k) Plan v. Variable Annuity Life Ins. Co.*, 88 F.4th 602, 609-12 (5th Cir. 2023) ("Because [the provider] was not yet providing services to the Plan, we conclude that [the provider] was not a

'party in interest' under § 1106(a) when it entered the … Contract."). Plaintiffs nowhere allege that Mercer was a party in interest to the Plan *before* negotiating any agreement to broker insurance coverage, and it is the payments Mercer received pursuant to its brokerage agreement that Plaintiffs attack as prohibited transactions in Count VI.

## IV. Plaintiffs Fail to Show Entitlement to any Equitable Relief Against Mercer.

ERISA forecloses damages remedies against non-fiduciaries, even if they participate in a fiduciary's breach. *See Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255-59, 262 (1993). Because Mercer was not a fiduciary, *see supra*, Part II.A, Plaintiffs cannot obtain damages from it.

Although Plaintiffs claim Mercer is liable for "equitable relief" under ERISA § 502(a)(3), ¶ 275, Plaintiffs are actually seeking legal (monetary) relief, not equitable relief, from Mercer. Section 502(a)(3) only allows recovery from a "particular fund" in the defendant's possession, "distinct from [defendant's] general assets." *Sereboff v. Mid Atl. Med. Servs., Inc.*, 547 U.S. 356, 363-64 (2006). Here, Plaintiffs have not alleged any "particular fund" in Mercer's possession that represents its alleged ill-gotten gains. They instead seek "an order requiring [Mercer] to reimburse the plan—in other words, [they] ask[] for money damages, the epitome of legal relief." *Id.* at 453-54; *see also Mooney v. Ill. Educ. Assoc.*, 942 F.3d 368, 371 (7th Cir. 2019). As a result, "the restitution sought … [is] legal—not equitable. . . ." *Montanile v. Bd. of Trs. of Nat'l Elevator Indus. Health Benefit Plan*, 577 U.S. 136, 143 (2016). Because Section 502(a)(3) only provides for equitable relief, and Counts V and VI seek monetary relief, those counts must be dismissed.

## CONCLUSION

For the foregoing reasons, the Amended Complaint should be dismissed with prejudice.

22

Dated:  May 20, 2026

Respectfully Submitted,

*/s/ Alison V. Douglass*
Alison V. Douglass, *admitted pro hac vice*
James O. Fleckner, *admitted pro hac vice*
Katherine G. McKenney, *admitted pro hac vice*
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000
ADouglass@goodwinlaw.com
JFleckner@goodwinlaw.com
KMcKenney@goodwinlaw.com

*Attorneys for Defendant Mercer Health and Benefits
Administration, LLC*